

Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | P. Michael Mahoney | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 50044 | **DATE** | 12/23/2003 |
| **CASE TITLE** | | Pazera vs. Barnhart | |

MOTION:

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]    For the reasons stated on the attached Memorandum Opinion and Order, the ALJ's decision to deny benefits to Plaintiff is sustained. The ALJ is affirmed at all steps of the disability determination process as outlined above. Defendant's Motion for Summary Judgment is granted. Plaintiff's Motion for Summary Judgment on the administrative record and pleadings is denied.

*Mahoney, U*

(11) ■ [For further detail see order attached to the original minute order.]

| | |
|---|---|
| | No notices required, advised in open court. |
| | No notices required. |
| ✓ | Notices mailed by judge's staff. |
| | Notified counsel by telephone. |
| | Docketing to mail notices. |
| ✓ | Mail AO 450 form. |
| | Copy to judge/magistrate judge. |

courtroom deputy's initials    sp

number of notices

**DEC 23 2003**
date docketed

docketing deputy initials

12/23/2003
date mailed notice

sp
mailing deputy initials

Document Number

FILED-WD
03 DEC 23 PM 1:56
CLERK
U.S. DISTRICT COURT

Date/time received in central Clerk's Office

# United States District Court
## Northern District of Illinois
### Western Division

MONICA PAZERA

v.

JO ANNE BARNHART

**JUDGMENT IN A CIVIL CASE**

Case Number: 03 C 50044

☐    Jury Verdict. This action came before the Court for a trial by jury. The issues have been tried and the jury rendered its verdict.

■    Decision by Court. This action came to hearing before the Court. The issues have been heard and a decision has been rendered.

IT IS HEREBY ORDERED AND ADJUDGED that Defendant's motion for summary judgment is granted and plaintiff's motion for summary judgment is denied. Judgement is entered in favor of Jo Anne Barnhart and against Monica Pazera.

Michael W. Dobbins, Clerk of Court

Date: 12/23/2003

Gale L. Graeff, Deputy Clerk

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### WESTERN DIVISION

| | | |
|---|---|---|
| MONICA K. PAZERA, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 03 C 50044 |
| | ) | |
| v. | ) | Magistrate Judge |
| | ) | P. Michael Mahoney |
| JO ANNE B. BARNHART, | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

### MEMORANDUM OPINION AND ORDER

Monica K. Pazera ("Plaintiff") seeks judicial review of the final decision of the Commissioner of the Social Security Administration ("Commissioner"). *See* 42 U.S.C. §§ 405(g), 1383(c)(3). The Commissioner's final decision denied Plaintiff's application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") pursuant to Title XVI of the Social Security Act (the "Act"). 42 U.S.C. §1381(a). This matter is before the Magistrate Judge pursuant to consents filed by both parties on April 7, 2003. *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.

## I.    BACKGROUND

Plaintiff filed for DIB and SSI on July 31, 2001, alleging disability on March 31, 2001. (Tr.124 and 279 respectively). Plaintiff's application for benefits was denied on December 5, 2001. (Tr. 285). On December 17, 2001, Plaintiff filed a request for reconsideration. (Tr. 292). Plaintiff's request for reconsideration was denied on March 21, 2002. (*Id.*). Plaintiff then filed a request for a hearing before an Administrative Law Judge ("ALJ") on April 4, 2002. (Tr. 101). Plaintiff appeared, with counsel, before an ALJ on August 21, 2002. (Tr. 23). In a decision dated September

27, 2002, the ALJ found that Plaintiff was not entitled to DIB or SSI. (Tr. 22). On October 2, 2002, Plaintiff requested a review of the ALJ's decision by the Appeals Council. (Tr. 10). On December 19, 2002, the Appeals Council denied Plaintiff's request for review. (Tr. 7).

## II.  FACTS

Plaintiff was born on January 20, 1979 and was twenty-three years old at the time of her August 21, 2002 hearing. According to her own testimony, Plaintiff did not graduate from high school but she did receive her GED. (Tr. 29). At the time of her hearing, Plaintiff was not married and lived by herself (two years prior to her hearing Plaintiff lived with her boyfriend). (Tr. 28). Plaintiff is approximately five foot five inches tall and weighed, at the time of hearing, approximately two hundred ten pounds. (Tr. 29). According to Plaintiff, this amount fluxuates often. (*Id*.). Also at the time of her hearing, Plaintiff was taking Metformin and Sebro. (*Id*.). Plaintiff stated that Metformin was for Plaintiff's polycystic ovarian syndrome and Sebro was for acne. (Tr. 30). Plaintiff suffers from an anxiety disorder and it is for that reason that Plaintiff claims to be disabled.

Plaintiff stated that on March 31, 2001 she had "severe depression" and she felt like "people were after [her] and [her] job and trying to get [her] fired ... ." (Tr. 31). Plaintiff alleges that the feelings started on March 31, 2001. Although confusing, it appears Plaintiff was working at Hollywood Entertainment on March 31, 2001 when the feelings started. (Tr. 32). What Plaintiff did at Hollywood Entertainment will be discussed later because Plaintiff's testimony jumps first to her work for Magazine Net which occurred in May or June 2001. (*Id*.). Plaintiff stated at Magazine Net she picked magazines off the line and put them in shipping boxes. Typically, Plaintiff was required to lift five to thirty five pounds over the course of an eight hour day on her feet. (Tr. 33). Plaintiff

2

left her job at Magazine Net because she felt people were after her. (Tr. 34). While she was unable to provide specific reasons for while she felt that way, Plaintiff stated that she would get "antsy, and feel people are, like, wanting me and wanting me to lose my job ... ." (*Id.*). Additionally, Plaintiff stated she has overheard her coworkers talking about how she is strange. (*Id.*).

Where it gets a bit confusing is that Plaintiff later testified that she left Hollywood Entertainment in November 2001. (Tr. 34). When asked if she worked for Hollywood Entertainment and Magazine Net simultaneously because the dates seem to overlap, Plaintiff stated she started at Magazine Net shortly after Hollywood Entertainment, even though she previously stated she started to get strange feelings while working at Hollywood Entertainment in March 2001.

Nonetheless, Plaintiff stated she worked at Hollywood Entertainment through August and September 2001. (Tr. 35). At Hollywood Entertainment, Plaintiff initially performed general customer service type jobs such as locating video tapes for customers, entering movie rentals into a computer, and answering telephone calls from customers. (*Id.*). Plaintiff typically worked eight hours a day but worked fifteen hour shifts occasionally when people would not show up for their shift. (Tr. 36). Plaintiff's customer service job was only temporary, because Plaintiff testified that after a month she was promoted to shift leader. (*Id.*). As a shift leader, Plaintiff would have to fill out paperwork and assess the monetary intake for the day and fill out receipts. (*Id.*). Additionally, Plaintiff opened and closed the store, took care of customer complaints, and assigned tasks and duties for employees. (Tr. 37). Plaintiff stated that she had trouble assigning duties to employees because they would not do what was asked of them so Plaintiff would just do the job herself. (Tr. 38). Plaintiff was terminated from Hollywood Entertainment due to attendance problems. (*Id.*). Plaintiff stated that she had car problems and personal family issues that required her to miss work,

3

and even though Plaintiff testified that she called in on days she had car troubles and made arrangements for people to cover her when she had family problems (but the people did not show up), she was ultimately terminated. (Tr. 39). Plaintiff testified that she would be unable to do either job at Hollywood Entertainment now because she is unable to get people to do things and she does not like being around people because she is scared. (*Id.*).

Prior to working for Magazine Net or Hollywood Entertainment, Plaintiff worked for Subway in 2000, although the exact dates are not known. (Tr. 40). At Subway, Plaintiff primarily made sandwiches and did some occasional lifting of no more then ten pounds. (*Id.*). Prior to Subway, in either 1997 or 1998, Plaintiff worked for Picadilly's. (Tr. 41). At Picadilly's, Plaintiff cooked pizzas and worked the cash register. (*Id.*). Additionally, Plaintiff delivered pizzas. Plaintiff's job at Picadilly's required her to lift no more then fifteen pounds over the course of a five hour day. (*Id.*). Plaintiff worked at Picadilly's for seven months. (Tr. 42).

In terms of Plaintiff's day-to-day activities, Plaintiff indicated that she normally cleans the house. (*Id.*). This, according to Plaintiff, includes vacuuming, sweeping, and washing dishes. (*Id.*). Plaintiff stated that she does not do her own shopping (either grocery or clothing) but rather her mother does all her shopping. (*Id.*). Plaintiff testified that she had not been shopping by herself for at least two years prior to her hearing date because she had been "sexually assaulted a couple times." (Tr. 43). These incidents allegedly occurred once in 1999 and once when Plaintiff was four years old. (*Id.*). In addition to her household cleaning, Plaintiff sees her friends daily when they come to her house. Plaintiff seldom goes over to her friends' houses. (*Id.*). However, Plaintiff later testified that two or three times a month, Plaintiff will not leave her house or see anybody for days at a time. (Tr. 51).

4

When Plaintiff lived with her boyfriend, Plaintiff stated that they would, in addition to fighting (verbally, not physically), often watch movies, listen to music, or play cards. (Tr. 44). Plaintiff testified that she and her boyfriend would never go out to a movie, dinner, or go dancing. (Tr. 45).

Plaintiff stated that on a normal day, she often has trouble remembering to pay her bills and take her medicine. (*Id.*). Additionally, Plaintiff stated she often goes to the store and forgets what she was going to buy. (*Id.*). Plaintiff stated that her forgetfulness had been occurring for about five years previous to her hearing date and had gotten progressively worse with time. (*Id.*).

In terms of Plaintiff's depression or anxiety, Plaintiff stated she first started having problems with such things in 1995. (Tr. 47). At the time, Plaintiff was in what she called a "bad relationship." (*Id.*). This relationship, which Plaintiff testified included physical and mental abuse, lasted five years. (*Id.*). Plaintiff stated that, as a result of this relationship, she deals with anxiety and depression daily and she has no drive to do or accomplish anything. (Tr. 48).

When asked by Plaintiff's counsel about her attention and concentration, Plaintiff stated that she cannot keep her attention focused on a television program for a complete hour. (Tr. 55). Plaintiff stated that her "mind goes off on other things." (*Id.*). Additionally, Plaintiff testified that she has not slept well and the day before the hearing she did not sleep at all. (*Id.*). In fact, Plaintiff stated that, on a normal day, for a couple years prior to the hearing, she does not fall asleep until four or five in the morning and wakes at eight in the morning. (Tr. 56). Plaintiff later testified that she drinks four or five beers a night to help her fall asleep. (Tr. 60).

Plaintiff has apparently attempted suicide at least two times. In 2000, Plaintiff testified that she cut her wrists. (Tr. 62). Plaintiff required both psychiatric and physical treatment as a result of

5

her cutting her wrists. (*Id.*). Additionally, two months prior to the hearing, Plaintiff stated she was "going to drink some bleach." (*Id.*). Both of these incidents involved fights with her boyfriends at the time. (Tr. 63). Aside from those two attempts, Plaintiff testified that she thinks about hurting herself once a week. (*Id.*). In addition to her suicide attempts, Plaintiff testified that from her early teens up until six months prior to the hearing, she heard a voice she identified as Fred. (Tr. 64). This voice told her not to hurt herself. (*Id.*).

Vocational Expert, Cheryl Hoiseth, appeared before the ALJ during Plaintiff's August 2002 hearing. (Tr. 67). Ms. Hoiseth first testified that all of Plaintiff's prior jobs would be deemed unskilled, with the customer service job classified as light work, the packer job classified as light to medium work, the Subway job classified as light work, and the Picadilly job classified as light work. (Tr. 70). With that in mind, the ALJ asked Ms. Hoiseth whether a hypothetical female, with the following characteristics, could perform prior work:

> that's 23 years of age. Has a high school education by GED, with the ability to read, write, and use numbers and the same prior work history as the [Plaintiff] in this case. That the individual, having the capacity to perform work with the following and no other additional limitations. The individual can perform a full range of work, let's say at all exertional levels, but would not have the capacity to understand, recall, focus upon, or carry out complex or detailed instructions. Nor would the individual have the capacity to maintain such extended attention and concentration as would be required to perform complex or detailed tasks at a sustained and workmanlike pace. The individual would, however, retain the capcacity to understand, recall, focus on, and carry out simple instructions and could perform, let's say simple and repetitive tasks at a sustained workmanlike pace. The individual may not, however, perform work that requires more than incidental contact with numbers of the general public.

(Tr. 72). Ms. Hoiseth testified that such a hypothetical female could not perform the Hollywood Entertainment job either as customer service or a shift leader. (*Id.*). However, such individual,

6

according to Ms. Hoiseth, could perform the packer job. The Subway and Picadilly job would also be excluded because of the exposure to the general public. (*Id.*).

Turning to the regional economy, Ms. Hoiseth testified that the hypothetical female could perform jobs as a kitchen helper (1,400 medium jobs and 3,000 light jobs in the Chicagoland area and nine surrounding counties), cleaner (9,000 medium jobs and 6,000 light jobs in the Chicagoland area and nine surrounding counties), and packer (5,000 medium jobs and 9,000 light jobs in the Chicagoland area and nine surrounding counties). (Tr. 73-74).

When asked to assume the hypothetical female could not perform work which "requires working in direct cooperation, in concert if you will, with coworkers in performing joint-type tasks or mutually assigned projects, but would have the capacity to perform individually assigned work tasks. ... and may not perform which requires frequent change in the nature of the work task or in the work processes or work procedures," Ms. Hoiseth stated that such an individual could not perform the packer job. (Tr. 74). However, the cleaner and kitchen helper jobs would remain. (*Id.*). Further, the ALJ asked Ms Hoiseth whether any of the above mentioned jobs would be excluded if

> lifting and carrying would be limited to 20 pounds on a frequent basis and 10 pounds frequently. Sitting, standing, and walking respectively, with normal breaks, could be performed at six hours each in an eight hour day. That the individual may climb, balance, stoop, kneel crouch, and crawl on no more than an occasional basis. And must avoid concentrated exposure to fumes, odors, dust, gasses, or other pulmonary irritants.

(Tr. 74-75). Ms. Hoiseth testified that the kitchen helper job would be eliminated at both light and medium work levels and the cleaner job would be eliminated at both levels, because of the fumes. (*Id.*). However, Ms. Hoiseth testified that a person with all the above mentioned limitations could perform work as an assembler at the light level. (*Id.*).

7

Lastly, the ALJ asked Ms. Hoiseth whether the hypothetical individual could perform any jobs if the limitation would further include that "the individual did not have the capacity to sustain mental activities or work, which would include sustaining attention and concentration, sustaining focus, and sustaining the workmanlike pace for a combine total of at least six to eight hours per day, five days a week." (Tr. 76). Ms. Hoiseth stated such an individual would not be able to perform any unskilled work. (*Id.*).

## III.   **MEDICAL HISTORY**

The earliest medical report before this court is a disturbing one dated April 3, 2001. (Tr. 183). Dr Alvydas Baris, Emergency Department Doctor at Swedish American Hospital, reported that Plaintiff came to the emergency room alleging she was raped. (*Id.*). According to Plaintiff, on April 2, 2001, while she was sleeping, a person she identified to Dr. Baris as her cousin, allegedly came into Plaintiff's room, climbed on top of her, held her arms down, and raped Plaintiff. (*Id.*). Plaintiff indicated to Dr. Baris that she was having some pain in her vaginal area with mild lower abdominal pain but no upper abdominal pain. Dr. Baris' physical examination of Plaintiff revealed that Plaintiff was alert, oriented, cooperative, well hydrated, and in no acute distress. (*Id.*). Additionally, Dr. Baris reported that Plaintiff's external genitalia appeared to be normal, with no evidence of unusual swelling, bruising or abrasions.

Plaintiff filled out an Activities of Daily Living Questionnaire on August 17, 2001. (Tr. 162). On the questionnaire, Plaintiff indicated that, among other things, she often watches television, sometimes fixes things, talks on the phone, pays bills, and goes out to eat, and rarely reads, watches children, plays cards or games, goes to sports events, goes to church, talks to neighbors, volunteers, goes to movies, or goes to school. (Tr. 164). Additionally, Plaintiff indicated that she gets angry

with people easily because she has "a lot of rage." (*Id.*).

A psychological assessment was performed on Plaintiff on October 12, 2001 to assist in the determination of Plaintiff's social security disability status and eligibility. (Tr. 199). On October 15, 2001, Dr. Mark B. Langgut, a clinical psychologist, filed a report. In his report, Dr. Langgut indicated that Plaintiff was "somewhat oddly dressed and disheveled but a clean young woman with a dour expression and downcast gaze. She was adequately groomed and adequately dressed in clothing that was appropriate to her age and weather, ... ." (*Id.*). Plaintiff was accompanied by her mother. (*Id.*). In terms of Plaintiff's historical information, Dr. Langgut reported that Plaintiff's brother and father are alcoholics and Plaintiff's mother suffers from depression. (Tr. 200). Plaintiff was raised by both parents until they divorced. Dr. Langgut also reported that Plaintiff was sexually abused by a babysitter's boyfriend, a cousin, and a cousin's boyfriend on three occasions, at age four, fifteen and twenty-one. (*Id.*). With regards to Plaintiff's mental examination, Dr. Langgut reported that Plaintiff "displayed limited attention, concentration, and effort during the assessment of her mental capacity. During the assessment of her immediate recall ability, her inconsistent responses indicated her poor concentration and attention as opposed to being related to persistent memory problems." (Tr. 201). Additionally, Dr. Langgut reported Plaintiff had impairments in "judgment, reasoning, comprehension, and arithmetic ability ... ." (*Id.*). Ultimately, Dr. Langgut's diagnostic considerations consisted of possible: post-traumatic stress disorder, major depressive disorder, history of child abuse, and borderline personality disorder. (Tr. 203).

On November 20, 2001, Kirk W. Boyenga, Ph.D, filled out a Psychiatric Review Technique Form indicating that Plaintiff suffers from Affective Disorders (Listing 12.04) and Anxiety-Related Disorder (Listing 12.06)(Tr. 206). With regards to Affective Disorders, Dr. Boyenga indicated

Plaintiff suffers from a depressive syndrome characterized by sleep disturbance, decreased energy, and difficulty in concentrating or thinking. (Tr. 209). With regard to Anxiety-Related Disorders, Dr. Boyenga reported that Plaintiff's anxiety is evidenced by her recurrent and intrusive recollections of traumatic experiences. (Tr. 211). In terms of Plaintiff's functional limitations, Dr. Boyenga reported that Plaintiff's restrictions on activities of daily living are mild, her limitation in maintaining social functioning is moderate, and her limitation in maintaining concentration, persistence or pace is moderate. (Tr. 216).

Also on November 20, 2001, Dr. Boyenga performed and filled out a Mental Residual Functional Capacity Assessment form. (Tr. 220). Dr. Boyenga reported that Plaintiff's understanding and memory are not significantly limited. (*Id.*). With regard to Plaintiff's sustained concentration and persistence, Dr. Boyenga reported that Plaintiff was not significantly limited in her ability to carry out very short and simple instructions, perform activities within a schedule, sustain an ordinary routine without special supervision, or make simple work-related decisions. (*Id.*). Dr. Boyenga did, however, report that Plaintiff was moderately limited in her ability to carry out detailed instructions, maintain attention and concentration for extended periods and complete a normal workday and workweek without interruptions from psychologically based symptoms. (*Id.*).

With regards to Plaintiff's ability to socially interact, Dr. Boyenga reported that Plaintiff was not significantly limited in her ability to ask simple questions, request assistance or maintain socially appropriate behavior. (Tr. 221). Plaintiff was moderately limited, however, in her ability to interact appropriately with the general public. (*Id.*). Dr. Boyenga found no evidence with regards to Plaintiff's ability to accept instructions and respond appropriately to criticism or her ability to get along with coworkers or peers. (*Id.*). Finally, Dr. Boyenga reported that, with regards to adaptation,

10

Plaintiff was not significantly limited in her ability to be aware of normal hazards, travel to unfamiliar places, use public transportation, set realistic goals, or makes plans independently of others. (*Id.*). Dr. Boyenga did report, however, that Plaintiff was moderately limited in her ability to respond appropriately to changes in the work setting. (*Id.*). Ultimately, Dr. Boyenga reported that while Plaintiff's understanding and concentration are impaired, she can nonetheless perform simple tasks, as indicated by her ability to maintain personal hygiene, do repairs, shop, do laundry, and assist customers in a video store. (Tr. 222). Additionally, while Plaintiff's social skills are impaired, she nonetheless can interact with others in a reduced interpersonal setting. Finally, while Plaintiff's adaptation abilities are impaired, she nonetheless can perform routine, repetitive tasks as indicated by her ability to follow instructions and travel independently. (*Id.*).

Also on November 21, 2001, Gayle Gonzalez filed a Report of Contact. (Tr. 172). The report indicated that Plaintiff's November 21, 2001 Mental Capacity Assessment made clear that Plaintiff has the ability to perform simple tasks, routine, repetitive tasks and reduced interpersonal contact. (*Id.*). Based on the above, according to Ms. Gonzalez, Plaintiff cannot be considered disabled because there are a sufficient number of jobs within the occupational base which do not require dealing with the public, close supervision or close cooperation with co-workers. (*Id.*). These jobs include: flumer, drier attendant, and box bender. (*Id.*).

Plaintiff filed out another Activities of Daily Living Questionnaire on January 4, 2002. (Tr. 173). Many of the responses were similar to Plaintiff's August 2001 answers. What did change, however, is that Plaintiff indicated that she watches television often, drives and talks on the phone sometimes, but rarely, if ever, reads, watches children, fixes things, plays cards, performs hobbies, goes to sports events, goes to church, talks to neighbors, volunteers, pays bills, goes out to eat, goes

11

to movies, or goes to school. (Tr. 175). Additionally, when asked if she was afraid of people, Plaintiff responded, "yes, they are out to get me." (*Id.*).

Dr. Carol Dubois, of the Janet Wattles Center, filled out a psychiatric progress note on January 17, 2002. (Tr. 257). Dr. Dubois reported that Plaintiff complained that she has felt depressed most of her life and she has experienced weight gain (around twenty five pounds), excessive sleep (around twelve hours a day), low self-image and little motivation. (*Id.*). Dr. Dubois reported that Plaintiff's mental status examination revealed a well developed, well nourished, obese female with intermittent and cooperative responses to questions asked to her. (*Id*). However, Dr. Dubois also reported that Plaintiff had a depressive disorder with a GAF of 50. (*Id.*). Dr. Dubois started Plaintiff on 150 mgs of Wellbutrin SR once a day. (*Id.*). Plaintiff returned to see Dr. Dubois on February 1, 2002. (Tr. 259). Dr. Dubois reported that Plaintiff came in "mildly better but not yet back to where she wants to be." (*Id.*).

On February 7, 2002, Dr. Dubois filled out a form for the Bureau of Disability Determination Services. (Tr. 230). Dr. Dubois indicated Plaintiff appears "depressed and generally sad." (*Id.*). However, Dr. Dubois reported that Plaintiff is "generally cooperative and compliant. She does lack motivation, but I feel she has the capacity to adapt to work pressures and ask questions appropriately when requested." (*Id.*).

On March 6, 2002, another Psychiatric Review Technique was done for Plaintiff. (Tr. 236). The reviewing doctor (name not legible) reported that Plaintiff suffers from Affective Disorders (Listing 12.04) and Anxiety-Related Disorder (Listing 12.06)(*Id.*). With regards to Affective Disorders, the doctor indicated Plaintiff suffers from a depressive syndrome characterized by a pervasive loss of interest in almost all activities, appetite disturbance, sleep disturbance,

psychomotor agitation, decreased energy, difficulty in concentrating or thinking, and suicide. (Tr. 239). With regard to Anxiety-Related Disorders, the doctor reported that Plaintiff's anxiety is evidenced by her recurrent and intrusive recollections of traumatic experiences. (Tr. 246). In terms of Plaintiff's functional limitations, the doctor reported that Plaintiff's restrictions of activities of daily living is mild, her limitation in maintaining social functioning is moderate, and her limitation in maintaining concentration, persistence or pace is moderate. (*Id.*).

Also on March 6, 2002, the above mentioned doctor (again, name not legible) performed and filled out a Mental Residual Functional Capacity Assessment form. (Tr. 250). The doctor reported that Plaintiff's understanding and memory are not significantly limited, except that Plaintiff's ability to understand and remember detailed instructions was moderately limited. (*Id.*). With regard to Plaintiff's sustained concentration and persistence, the doctor reported that Plaintiff was not significantly limited in her ability to carry out very short and simple instructions, perform activities within a schedule, sustain an ordinary routine without special supervision, make simple work-related decisions or maintain attention and concentration for extended periods and complete a normal workday and workweek without interruptions from psychologically based symptoms. (*Id.*). The doctor did, however, report that Plaintiff was moderately limited in her ability to carry out detailed instructions, maintain attention and concentration for extended periods and work in coordination with others without being distracted. (*Id.*).

With regards to Plaintiff's ability to socially interact, the doctor reported that Plaintiff was not significantly limited in her ability to ask simple questions, request assistance or maintain socially appropriate behavior. (Tr. 251). Plaintiff was moderately limited, however, in her ability to interact appropriately with the general public, accept instructions and respond appropriately to criticism, and

13

get along with coworkers. (*Id.*). Finally, the doctor reported that, with regards to adaptation, Plaintiff was not significantly limited in her ability to respond appropriately to changes in the work setting, be aware of normal hazards, travel to unfamiliar places, use public transportation, set realistic goals, or makes plans independently of others. (*Id.*).

## IV.    STANDARD OF REVIEW

The court may affirm, modify, or reverse the ALJ's decision outright, or remand the proceeding for rehearing or hearing of additional evidence. 42 U.S.C. § 405(g). Review by the court, however is not *de novo*; the court "may not decide the facts anew, reweigh the evidence or substitute its own judgment for that of the [ALJ]." *Binion v. Charter*, 108 F.3d 780, 782 (7th Cir. 1997); *see also Maggard v. Apfel*, 167 F.3d 376, 379 (7th Cir. 1999). The duties to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide the case accordingly are entrusted to the commissioner; "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits, the responsibility for that decision falls on the Commissioner." *Schoenfeld v. Apfel*, 237 F.3d 788, 793 (7th Cir. 2001). If the Commissioner's decision is supported by substantial evidence, it is conclusive and this court must affirm. 42 U.S.C. § 405(g); *see also Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). "Substantial evidence" is "evidence which a reasonable mind would accept as adequate to support a conclusion." *Binion*, 108 F.3d at 782.

The Seventh Circuit demands even greater deference to the ALJ's evidentiary determinations. So long as the ALJ "minimally articulate[s] his reasons for crediting or rejecting evidence of disability," the determination must stand on review. *Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992). Minimal articulation means that an ALJ must provide an opinion that enables a

reviewing court to trace the path of his reasoning. *Clifford v. Apfel*, 227 F.3d 863, 874 (7th Cir. 2000), *Rohan v. Chater*, 98 F.3d 966, 971 (7th Cir. 1996). Where a witness credibility determination is based upon the ALJ's subjective observation of the witness, the determination may only be disturbed if it is "patently wrong" or if it finds no support in the record. *Pope v. Shalata*, 998 F.2d 473, 487 (7th Cir. 1993), *Imani v. Heckler*, 797 F.2d 508, 512 (7th Cir. 1986), cert. denied. "However, when such determinations rest on objective factors of fundamental implausibilities rather than subjective considerations, [reviewing] courts have greater freedom to review the ALJ decision." *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994), *Yousif v. Chater*, 901 F. Supp. 1377, 1384 (N.D. Ill. 1995).

## V.     <u>FRAMEWORK FOR DECISION</u>

The ALJ concluded that Plaintiff did not meet the Act's definition of "disabled," and accordingly denied her application for benefits. "Disabled" is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(3)(A). A physical or mental impairment is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382c(3)(C). *See Clark v. Sullivan*, 891 F.2d 175, 177 (7th Cir. 1988).

The Commissioner proceeds through as many as five steps in determining whether a claimant is disabled. 20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f) (1998).[1] The Commissioner sequentially

---

[1]The Commissioner has promulgated parallel regulations governing disability determinations under Title II and Title XVI. See 20 C.F.R. Ch. III, Parts 404, 416. For syntactic simplicity, future references to Part 416 of the regulations will be omitted where they are

determines the following: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant suffers from a severe impairment; (3) whether the impairment meets or is medically equivalent to an impairment in the Commissioner's Listing of Impairments; (4) whether the claimant is capable of performing work which the claimant performed in the past; and (5) whether the claimant is capable of performing any other work in the national economy.

At Step One, the Commissioner determines whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520 (a),(b). Substantial gainful activity is work that involves doing significant and productive physical or mental duties that are done, or intended to be done, for pay or profit. 20 C.F.R. § 404.1510. If the claimant is engaged in substantial gainful activity, he is found not disabled, regardless of medical condition, age, education, or work experience, and the inquiry ends; if not, the inquiry proceeds to Step Two.

Step Two requires a determination whether the claimant is suffering from a severe impairment.[2] A severe impairment is one which significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). The claimant's age, education, and work experience are not considered in making a Step Two severity determination. 20 C.F.R. § 404.1520(c). If the claimant suffers from severe impairment, then the inquiry moves on to Step Three; if not, then the claimant is found to be not disabled, and the inquiry ends.

At Step Three, the claimant's impairment is compared to those listed in 20 C.F.R. Ch. III,

---

identical to Part 404.

[2]The claimant need not specify a single disabling impairment, as the Commissioner will consider the combined affect of multiple impairments. See, e.g., 20 C.F.R. § 404.1520(c). For syntactic simplicity, however, this generic discussion of the Commissioner's decision-making process will use the singular "impairment" to include both singular and multiple impairments.

Part 404, Subpart P, Appendix 1. The listings describe, for each of the major body systems, impairments which are considered severe enough *per se* to prevent a person from doing any significant gainful activity. 20 C.F.R. §§ 404.1525(a). The listings streamline the decision process by identifying certain disabled claimants without need to continue the inquiry. *Bowen v. New York*, 476 U.S. 467, 470-71 (1986). Accordingly, if the claimant's impairment meets or is medically equivalent to one in the listings, then the claimant is found to be disabled, and the inquiry ends; if not, the inquiry moves on to Step Four.

At Step Four, the Commissioner determines whether the claimant's residual functional capacity allows the claimant to return to past relevant work. Residual functional capacity is a measure of the abilities which the claimant retains despite his impairment. 20 C.F.R. § 404.1545(a). Although medical opinions bear strongly upon the determination of residual functional capacity, they are not conclusive; the determination is left to the Commissioner, who must resolve any discrepancies in the evidence and base a decision upon the record as a whole. 20 C.F.R. § 404.1527(e)(2); *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995). Past relevant work is work previously performed by the claimant that constituted substantial gainful activity and satisfied certain durational and recency requirements. 20 C.F.R. § 404.1565; Social Security Ruling 82-62. If the claimant's residual functional capacity allows him to return to past relevant work, then he is found not disabled; if he is not so able, the inquiry proceeds to Step Five.

At Step Five, the Commissioner must establish that the claimant's residual functional capacity allows the claimant to engage in work found in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(f), 404.1566. The Commissioner may carry this burden by relying upon vocational expert testimony, or by showing that a claimant's residual functional capacity, age,

17

education, and work experience coincide exactly with a rule in the Medical-Vocational Guidelines (the "grids"). *See* 20 C.F.R. Ch. III, Part 404 Subpart P, Appendix 2; *Walker v. Bowen*, 834 F.2d 635, 640 ( 7th Cir. 1987); *Binion v. Shalala*, 13 F.3d 243, 246 (7th Cir. 1994); Social Security Law and Practice, Volume 3, § 43:1. If the ALJ correctly relies on the grids, vocational expert evidence is unnecessary. *Luna v. Shalala,* 22 F.3d 687, 691-92 (7th  Cir. 1994). If the Commissioner establishes that sufficient work exists in the national economy that the claimant is qualified and able to perform, then the claimant will be found not disabled; if not, the claimant will be found to be disabled.

## VI.    ANALYSIS

The court will proceed through the five step analysis in order.

A. Step One: Is the claimant currently engaged in substantial gainful activity?

In performing the Step One Analysis, the ALJ found that Plaintiff may not have engaged in any substantial gainful activity at any time relevant to his decision issued on September 27, 2002. (Tr.16). Specifically, the ALJ stated that while Plaintiff's alleged onset date is March 31, 2001, Plaintiff "worked as a packer until June 2001 ... ." (*Id.*). Additionally, Plaintiff worked in customer service and as an assistant manager from August 2001 to September 2001. However, the ALJ still proceeded past Step One because the ALJ stated "although the [Plaintiff] did perform some work after the alleged onset date, it is not necessary to determine definitively whether that work was 'substantial gainful activity,' because there exists an independent basis for denying the [Plaintiff's] application, ... ." (*Id.*).

Under ordinary circumstances, a claimant is engaged in substantial gainful activity if the claimant's earnings averaged more than seven hundred and eighty dollars per month for years after

January 1, 2001. (20 C.F.R. § 1574 (b) (2) Table 1, as modified by 65 FR 82905, December 29, 2000). While it appears (although not definitively) that some of Plaintiff's activities after her onset date may have qualified as substantial gainful activity, the ALJ proceeded to the other steps and that analysis is not challenged by either party. Thus, because neither party challenges the analysis at Step One, this court will proceed.

B. Step Two: Does the claimant suffer from a severe impairment?

In performing the Step Two Analysis, the ALJ found Plaintiff suffered from severe impairments. Specifically, the ALJ found the Plaintiff suffers from: cervical/ovarian cysts; history of asthma/bronchitis; depression; and anxiety. (Tr. 20). The ALJ stated that the Plaintiff's "impairments significantly limit her ability to perform basic work activities." (*Id.*).

Substantial evidence exists to support the ALJ's determination that Plaintiff suffers from severe impairments. This finding is not challenged by either party and the court finds no reason to disturb it. The ALJ's finding as to Step Two of the Analysis is affirmed.

C.     Step Three: Does claimant's impairment meet or medically equal an impairment in the Commissioner's listing of impairments?

In performing the analysis for Step Three the ALJ determined that Plaintiff's impairments do not meet or equal any impairment in Appendix 1 to Subpart P of Regulations number 4. The ALJ found, in one conclusory sentence, that Plaintiff's "condition does not satisfy that standard." (*Id.*). This court does not want to beat the proverbial dead horse, but this court continually has concerns with the lack of depth and discussion it has seen at Step Three in recent opinions.

As this court has seen on numerous occasions, the ALJ failed to discuss, or even cite, Listing 12.04 or 12.06. Depending on the circuit, this omission alone would dictate remand. *Compare*

*Burnett v. Commissioner*, 220 F.3d 112, 119-20 (3d Cir. 2000)(remanding where the ALJ "'merely stated a summary conclusion that appellant's impairments did not meet or equal any Listed Impairments,' without identifying the relevant listed impairments, discussing the evidence, or explaining his reasoning.")(*citing Clifton v. Chater*, 79 F.3d 1007, 1009)(10th Cir. 1996)), *with Senne v. Apfel*, 198 F.3d 1065, 1067 (8th Cir. 1999)(holding that the conclusory form of the ALJ's decision alone does not justify remand). However, the Seventh Circuit has not decided whether failing to discuss or even cite a Listing at step three justifies remand. *See Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)(stating the Seventh Circuit need not address the tension between the circuits as to whether a conclusory statement at Step Three is fatal because the ALJ's decision could not stand even if she cited the correct rule). Even though the Seventh Circuit has not provided guidance on this issue, principles of administrative law require the ALJ to rationally articulate the grounds for his/her decisions thereby building "an accurate and logical bridge from the evidence ... ." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). This then allows the court to confine review to the reasons supplied by the ALJ. *See Johnson v. Apfel*, 189 F.3d 561, 564 (7th Cir. 1999); *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996).

The question then remains whether this court should remand because of the ALJ's failure to cite the listing or whether this court should determine whether remand is necessary given the medical record. The problem with the latter is that it necessitates that this court weigh evidence when that is not the role of this court in this process. However, because the findings at Step Three are so conclusory it is difficult to ascertain the process of this ALJ. Therefore, for the sake of judicial efficiency, this court will adopt a standard to handle conclusory Step Three analysis. That standard will be whether a reasonable ALJ could find that Plaintiff's impairments meet or medically equal

an impairment in the listings.

Section 12.04 states

*Affective Disorders*: Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life: it generally involves either depression or elation.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.

A.   Medically documented persistence, either continuous or intermittent, of one of the following:

1.   Depressive syndrome characterized by at least four of the following:

   a.   Anhedonia or pervasive loss of interest in almost all activities; or

   b.   Appetite disturbance with change in weight; or

   c.   Sleep disturbance; or

   d.   Psychomotor agitation or retardation; or

   e.   Decreased energy; or

   f.   Feelings of guilt or worthlessness; or

   g.   Difficulty concentrating or thinking; or

   i.   Hallucinations, delusions or paranoid thinking; or

2.   Manic syndrome characterized by at least three of the following:

   a.   Hyperactivity; or

   b.   Pressure of speech; or

   c.   Flight of ideas; or

   d.   Inflated self-esteem; or

   e.   Decreased need for sleep; or

   f.   Easy distractability; or

   g.   Involvement in activities that have a high probability of painful consequences which are not recognized; or

   h.   Hallucinations, delusions or paranoid thinking; or

3.   Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic an depressive syndromes (and currently characterized by either or both syndrome; AND

B.   Resulting in at least two of the following:

21

1.     Marked restriction of activities of daily living; or
2.     Marked difficulties in maintaining social functioning; or
3.     Marked difficulties in maintaining concentration, persistence, or pace; or
4.     Repeated episodes of decompensation, each of extended duration; OR

C.     Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more then a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1.     Repeated episodes of decompensation, each of extended duration; or
2.     A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
3.     Current history of 1 or more years' inability to function outside of highly supportive living arrangement, with an indication of continued need for such an arrangement.

Listing 12.06 states

Anxiety Related Disorders: In these disorders anxiety is either the predominant disturbance or it is experienced if the individual attempts to master symptoms; for example, confronting the dreaded object or situation in a phobic disorder or resisting the obsessions or compulsions in obsessive compulsive disorders.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in both A and C are satisfied.

A.     Medically documents findings of at least one of the following:

1.     Generalized persistent anxiety accompanied by three out of four of the following signs or symptoms:
   a.     Motor tension; or
   b.     Autonomic hyperactivity; or
   c.     Apprehensive expectation; or
   d.     Vigilance and scanning; or
2.     A persistent irrational fear of a specific object, activity, or situation which results in a compelling

desire to avoid the dreaded object, activity, or situation; or

3. Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week; or

4. Recurrent obsessions or compulsions which are a source of marked distress; or

5. Recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress: AND

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompression each of extended duration. OR

C. Resulting in complete inability to function independently outside the area of one's home.

In order to proceed efficiently, this court will jump to Section B of both Listings 12.04 and 12.06. Both Listing 12.04 and 12.06 require a finding of at least two areas of marked limitation within restrictions on activities of daily living, difficulties in maintaining social functioning, difficulties in maintaining concentration, or repeated episodes of decompression. The medical record indicates that Plaintiff cannot fulfill the requirements of Section B in either Listing 12.04 or 12.06. Neither her treating physician nor a non-treating physician found Plaintiff to have marked limitations as required in Section C. Additionally, it does not appear Plaintiff can fulfill Section C of either 12.04 or 12.06 because Plaintiff is capable of doing basic work activities (12.04) and it is apparent that Plaintiff can function independently outside of her home (12.06). Therefore, this court finds that no reasonable ALJ could find that Plaintiff is disabled under Listing 12.04 or 12.06 at Step Three.

Substantial evidence exists to support the ALJ's finding and this court finds no reason to

disturb it. Therefore, the ALJ's determination as to Step Three of the Analysis is affirmed.

D.     Step Four: Is the claimant capable of performing work which the claimant performed in the past?

In performing the analysis for Step Four, the ALJ determined that Plaintiff is unable to perform any of her past relevant work. Before doing so, the ALJ determined Plaintiff's RFC. In determining a mental RFC, the first step in the procedure is to assess the nature and extent of the Plaintiff's mental limitations and restrictions (20 C.F.R. § 416.945 (c)). This information is then used to determine the Mental RFC. In order to properly assess an individual's level of functioning due to a mental disorder, evaluation of the impairment must take into account the severity of the impairment over a period of time.(20 C.F.R. Ch. III, Part 404, Subpart P, Appendix 1 12.00 (d)). This information is then used to complete Plaintiff's vocational assessment. After considering the entire record, the ALJ found Plaintiff's RFC to include the following:

> lifting/carrying up to 20 pounds more than occasionally or 10 pounds more than frequently; sitting, standing, and or walking, respectively, and with normal breaks, for more than six hours each in an eight hour day; may climb balance, stoop, kneel, crouch, and crawl no more than occasionally; does not possess the capacity to understand, recall, focus upon or carry out complex or detailed instructions, or to maintain such extended attention/concentration as is required for the performance of complex or detailed tasks at a sustained workmanlike pace, but retains the capacity to understand, recall, focus upon and carry out simple instructions and to perform simple repetitive tasks at a sustained workmanlike pace; may not perform work which requires more than incidental contact with memebers of the general public or which requires frequent change in the nature of work tasks, work process or procedures; and may not perform work which requires working in cooperation and concert with coworkers for the performance of joint tasks or mutually assigned projects, but retains the capacity to perform individually assigned works tasks and the capacity to work alone on tasks.

(Tr. 16-17). With the above limitations, the ALJ found Plaintiff's past relevant work to be light to medium and unskilled. Under the RFC determined by the ALJ, the ALJ found that Plaintiff's prior work as a packer could be performed; however, the ALJ found the job was "likely not performed at the substantial gainful activity level." (Tr. 19). Therefore, the ALJ found that Plaintiff would not be able to perform any past work.

The finding of the ALJ as to Step Four of the Analysis is not challenged by either party and the court finds no reason to disturb this finding. The ALJ's determination as to Step Four of the Analysis is affirmed.

E.      Step Five: Is the claimant capable of performing any work existing in substantial numbers in the national economy?

At Step Five the ALJ determined that, based on Plaintiff's RFC, Plaintiff could perform a limited range of light work. (Tr. 20). Specifically, the ALJ found that, although Plaintiff's limitations prevent her from being able to perform the full range of light work, the evidence and the testimony of the vocational expert indicate that a person with Plaintiff's RFC would be capable of performed the following light unskilled jobs: kitchen helper, cleaner, and assembler. (*Id.*). Additionally, the ALJ found that "even if [Plaintiff] were required to avoid concentrated exposure to pulmonary irritants, the job of light assembler would exist, ... ." (*Id.*).

Plaintiff's strongest argument against the ALJ's ultimate decision is that the ALJ failed to properly analyze the Plaintiff's mental impairments in view of Plaintiff's treating and consulting medical records and opinions. (Pl.'s Mot. for Summ. J. at 5). More specifically, Plaintiff argues that the ALJ should have consulted a medical expert and given more weight to Plaintiff's treating sources, because they found Plaintiff's limitations greater in severity then the nontreating sources

who the ALJ appeared to follow in her limitation assessment.

The Seventh Circuit is not clear on the weight given a treating physician over a non-treating physician. In fact, there appears to be some conflict in the Seventh Circuit on the weight a treating physician should receive in determining whether an individual is disabled or not. *Compare Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000)(stating "the ALJ properly noted that more weight is generally given to the opinion of a treating physician because of his greater familiarity with the claimant's conditions and circumstances."); *Shramek v. Apfel*, 226 F.3d 809, 814 (7th Cir. 2000)(stating "A physician's opinion regarding the nature of severity of an impairment will be given controlling weight if it is well supported by the medically acceptable ... techniques."), *with Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 917 (7th Cir. 2003)(stating "physicians naturally tend to support their patients' disability claims, and so we have warned against 'the biases that a treating physician may bring to the disability evaluation.'")(citing *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001)); *Stephens v. Heckler*, 766 F.2d 284, 289 (7th Cir. 1985)(explaining that "the patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability.") Nonetheless, this court, and the code, give due deference to the treating physicians over non-treating physicians. However, that does not necessarily mean that in every case the treating physicians' opinion will be given controlling weight, regardless of non-treating sources. Rather, a balance must be done between the two sources.

In this case, even if the scale were to tip towards the treating physicians, this court would still not find remand necessary. Putting the non-treating sources aside, not one of Plaintiff's treating physicians ever indicated that Plaintiff is disabled. While Dr. Dubois reported that Plaintiff's GAF was 50, denoting serious symptoms, and many state agency doctors found Plaintiff to be "moderately" limited in her ability to maintain social functioning and in maintaining concentration, persistence, or pace, not one doctor, treating or non-treating, found Plaintiff to have any "marked" limitations. Rather, as Defendant has pointed out, Plaintiff's own treating physician, Dr. Dubois,

reported one month after reporting the GAF of 50, Plaintiff had the ability to adapt to work pressures and ask questions appropriately when required. (Def.'s Mot. for Summ. J. at 13)(citing Tr. 232). This evidence (that of Plaintiff's treating physician) coupled with the two detailed RFC assessments from non-treating reviewing state agency doctors, both of whom opined that Plaintiff would be able to perform simple, repetitive tasks with reduced interpersonal contact, make it unnecessary for the ALJ to have to consult a medical expert. Simply stated, neither Plaintiff's treating physicians nor non-treating physicians found any limitations that would find a contrary finding at Step Five. *See Green v. Apfel*, 204 F.3d 780, 781 (7th Cir. 2000)(stating that the ALJ is only required to summon a medical expert if there is not an adequate medical basis in the record to determine whether the claimant is disabled).

Therefore, substantial evidence exits to support the ALJ, and the ALJ's determination as to Step Five of the Analysis is affirmed.

## VII.   **CONCLUSION**

For the foregoing reasons, the ALJ's decision to deny benefits to Plaintiff is sustained. The ALJ is affirmed at all steps of the disability determination process as outlined above. Defendant's Motion for Summary Judgment is granted. Plaintiff's Motion for Summary Judgment on the administrative record and pleadings is denied.


**ENTER:**


P. MICHAEL MAHONEY, MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT


DATE: 12/23/03

27